IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

KERBY STRACCO,                          :
                                        :
            Plaintiff,                  :
                                        :
    v.                                  :        Civil Action No. 15-279-LPS
                                        :
NANCY A. BERRYHILL,                     :
Commissioner of Social Security         :
                                        :
            Defendant.                  :

---

Kerby Stracco, Gaithersburg, Maryland. *Pro se* Plaintiff.

David C. Weiss, Acting United States Attorney, Office of the United States Attorney, Wilmington, Delaware and Dina White Griffin, Special Assistant United States Attorney, Office of the General Counsel, of the Social Security Administration, Philadelphia, Pennsylvania.

Of Counsel: Nora Koch, Acting Regional Chief Counsel, Region III and Theresa A. Casey, Assistant Regional Counsel, of the Social Security Administration, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

March 16, 2017
Wilmington, Delaware

STARK, U.S. District Judge:

## I.      INTRODUCTION

Plaintiff Kerby Stracco ("Stracco" or "Plaintiff") appeals from the decision of Defendant

Nancy A. Berryhill, the Acting Commissioner of Social Security ("Commissioner" or "Defendant"),

denying her application for disability insurance benefits ("DIB") under Title II of the Social Security

Act, 42 U.S.C. §§ 401-434. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g).[1] Presently

pending before the Court are cross-motions for summary judgment filed by Stracco and the

Commissioner.[2] (D.I. 16, 17) For the reasons set forth below, the Court will grant Plaintiff's

motion to the extent she seeks a remand, will deny Defendant's motion, and will remand the matter

for further proceedings.

## II.     BACKGROUND

### A.      Procedural History

Stracco filed her application for DIB on May 15, 2013, alleging disability beginning January

1, 2012, and later amended the onset date to July 9, 2013, due to traumatic brain injury ("TBI"),

post-traumatic stress disorder ("PTSD"), bilateral plantar fasciitis and foot pronation, and bunions.

(D.I. 14-6 at 41) The application was denied on July 31, 2013, and upon reconsideration on

September 20, 2013. (D.I. 14-3 at 2-9, 21-40) Stracco filed a request for hearing on September 27,

2013. Hearings were held before an Administrative Law Judge ("ALJ") on February 11, 2014 and

---

[1]Under § 405(g), "[a]ny individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party . . . may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides . . . ." 42 U.S.C. § 405(g).

[2]The Court construes Plaintiff's December 17, 2015 letter response as a motion for summary judgment. (*See* D.I. 16)

August 18, 2014. The ALJ issued a decision finding that Stracco was not disabled under the Act.

Stracco filed a request for review by the Appeals Council, which was denied on November 20, 2014,

and the ALJ's decision became the final decision of the Commissioner. (D.I. 14-2 at 7-9)

On March 30, 2015, Stracco filed a Complaint seeking judicial review of the ALJ's

September 24, 2014 decision. (D.I. 1) Stracco moved for summary judgment on December 17,

2015, and the Commissioner filed a cross-motion for summary judgment on January 15, 2016. (D.I.

16, 17)

### B.      Medical Evidence

Plaintiff complained of hip pain in August 2009. (D.I. 14-15 at 26-28) Examination

revealed unremarkable results, including no instability or tenderness on palpation, and normal

motion, gait, and stability. (Id.) Plaintiff was diagnosed with left ear hearing loss and tinnitus in

February 2010. (D.I. 14-14 at 111) In February 2011, Plaintiff complained of foot pain while

training for a marathon. (D.I. 14-13 at 118, 119; D.I. 14-14 at 16) Her foot was x-rayed, with

normal results. (D.I. 14-13 at 119) The same year, Plaintiff was diagnosed with bunions. (D.I. 14-8

at 53, 105)

Plaintiff complained of hearing loss in August 2011. (D.I. 14-13 at 43) Plaintiff completed a

Hearing Loss Questionnaire in December 2011 and reported that she had suffered two TBIs and a

concussion. (D.I. 14-12 at 26) She was diagnosed with asymmetrical sensorineural hearing loss. (Id.

at 23) Plaintiff was unable to complete follow-up audiology testing in May 2012 due to dizziness.

(D.I. 14-7 at 10)

A March 2012 bilateral hip x-ray revealed normal results. (D.I. 14-8 at 80) An April 2012

brain MRI revealed normal result, as did a January 2013 ECG. (D.I. 14-7 at 50-51; D.I. 15-10 at 67)

January 2013 treatment notes indicate that Plaintiff was pregnant. (D.I. 15-9 at 68)

Plaintiff was seen by consultative examiner Walid Chalhoub, M.D. ("Dr. Chalhoub") in April 2014. (D.I. 15-14 at 46-57)  Plaintiff provided a history of lower back pain and left hip pain, which affected her ability to sit, stand, walk, bend and lift; foot pain, which affected her ability to perform prolonged standing, walking, and sitting; TBI, which affected her ability to be around others and deal with stress; and depression/PTSD, which caused poor mood control.  (*Id.* at 46-47) Plaintiff stated that she was able to sit for twenty minutes, stand for twenty minutes, walk one-half mile, and occasionally lift and carry fifteen pounds. (*Id.* at 47)

Examination revealed that Plaintiff was alert and oriented, made good eye contact, had fluent speech, an appropriate mood, clear thought processes, a normal memory, and good concentration. (*Id.* at 49)  The examination revealed full muscle strength, positive straight leg raising test, symmetric reflexes, and normal joints. (*Id.* at 49-50)  Plaintiff was able to lift, carry, and handle light objects, and squat and rise with ease. (*Id.* at 50)  During the examination, Plaintiff refused to walk on heels and toes, tandem walk, or hop on either foot. (*Id.*)  Dr. Chalhoub stated that Plaintiff was uncooperative and did not give a good effort during the examination. (*Id.*)

Dr. Chalhoub opined that Plaintiff could sit and stand normally in an eight-hour day with normal breaks; walk at least one hour at a time without a break, and at least two to three hours in an eight-hour workday and without an assistive device; and lift and carry at least fifty pounds frequently and seventy-five pounds occasionally. (*Id.* at 51)  He found no limitations in Plaintiff's ability to bend, stoop, crouch, or squat, and no manipulative, visual, communicative, or environmental limitations. (*Id.* at 51-56)

On July 31, 2013, state agency physician Lewis Singer, M.D. ("Dr. Singer") reviewed the record and opined that Plaintiff had no severe physical impairments. (D.I. 14-3 at 9)  On September

9, 2013, state agency physician Richard Surrusco, M.D. ("Dr. Surrusco") reviewed the record and also opined that Plaintiff had no severe physical impairments. (*Id.* at 30)

### C.   Mental Health Evidence

Plaintiff was deployed to Iraq in 2007-2008. (D.I. 14-11 at 35-38) She has a history of sexual trauma as well as combat related trauma. (D.I. 14-9 at 26) Plaintiff was stationed in Okinawa and, on October 25, 2010, she provided a history to Carolina Nisenoff, M.D. ("Dr. Nisenoff") that she had experienced a mild TBI following an improvised explosive device ("IED") blast in Iraq. (D.I. 14-14 at 46) Plaintiff reported symptoms of dizziness and disorientation. (*Id.*) She also reported that she experienced "temper problems" after she returned from deployment to Iraq in December 2008, that her symptoms worsened as she continued her career in the Army and this reminded her of her deployment experiences, and her symptoms related to her attention deficit hyperactivity disorder ("ADHD") had worsened. (*Id.*)

Upon examination Plaintiff had normal cognitive functioning, normal memory, normal judgment, normal speech, euthymic mood, normal affect, normal thought process, and no evidence of homicidal or suicidal ideation. (*Id.* at 14-14 at 37-38) Dr. Nisenoff diagnosed chronic PTSD and a personal history of TBI, assessed Plaintiff's GAF at 75-80,[3] and prescribed medication. (D.I. 14-14 at 38-39) On November 9, 2010, Plaintiff reported that her symptoms had improved. (*Id.* at 35-37)

---

[3]The Global Assessment of Functioning scale considers the psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. text revision 2000). However, the GAF scale was not included in the DSM-V, for several reasons, including its conceptual lack of clarity. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders (DSM-V) 16 (5th ed. 2013). A GAF score between 71 and 80 reflects that, if symptoms are present, they are transient and expectable reactions to psychosocial stressors (*e.g.,* difficulty concentrating after family argument); and no more than slight impairment in social, occupational, or school functioning (*e.g.,* temporarily falling behind in schoolwork). *See* DSM-IV-TR at 34.

In December 2010, Plaintiff reported that her primary issue was related to marital problems. (*Id.* at 37)  Therapist Daniel Murphy ("Murphy") diagnosed chronic PTSD, a history of TBI by personal history, and marital problems, and assessed Plaintiff's GAF at 65.[4]  (*Id.*)

A March 2011 evaluation by Dr. Nisenoff recorded unremarkable mental status findings, assessed Plaintiff's GAF at 75-80, and prescribed medication. (*Id.* at 5-11)  Other than a GAF of 65-70, Dr. Nisenoff made similar findings in May 2011, July 2011, and August 2011, and noted that Plaintiff was doing well. (D.I. 14-13 at 44-48, 53-57, 60-62, 100-01)  In June 2011, Plaintiff continued to deal with symptoms of anxiety related to her experiences in Iraq. (D.I. 14-13 at 90)  Clinical psychologist Steven Jacobson, Ph.D. ("Dr. Jacobson"), recorded normal mental status examination findings and assessed Plaintiff's GAF at 70. (D.I. 14-13 at 90)  He noted similar findings when Plaintiff was seen in July 2011 and August 2011. (*Id.* at 36, 50-51)  Evelyn Stender, M.D. ("Dr. Stender"), recorded normal mental status finding in August 2011 and noted that Plaintiff reported no side effects from her medication. (*Id.* at 34-35)

In October 2011, Cynthia Page, M.D. ("Dr. Page"), noted that Plaintiff sought inpatient mental health treatment after her husband requested a divorce. (*Id.* at 20)  Plaintiff also reported that she experienced a "serious" flashback during a fire drill. (*Id.* at 20)  Later that month, Plaintiff reported that she occasionally felt anxious, but her symptoms were manageable on medication. (*Id.* at 11)  Dr. Stender assessed Plaintiff's GAF at 55.[5]  (*Id.* at 12)  The next day, October 27, 2011, Dr. Nisenoff opined that Plaintiff was responding moderately well to treatment. (*Id.* at 9)

---

[4]A GAF score of 61-70 indicates some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, including having some meaningful interpersonal relationships. *See* DSM-IV-TR at 34.

[5]A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM-IV-TR at 34.

In November 2011, Plaintiff reported that she was getting better. (D.I. 14-13 at 2) On November 8, 2011, she indicated that she was overwhelmed by thoughts of her husband's infidelity and his request to separate. (D.I. 14-12 at 75) By December 2011, Plaintiff was doing better after deciding to pursue divorce. (*Id.* at 35) At her next session, Plaintiff reported that she became angry when her husband refused to fax a document necessary for her to finish her divorce paperwork and that she smashed items in her apartment. (*Id.* at 16) In late December 2011, Plaintiff discussed her future goals, including leaving Okinawa, where Plaintiff was stationed, and avoiding her husband and his girlfriend. (*Id.* at 17)

By January 2012, Plaintiff reported that her divorce was nearly finalized. (*Id.* at 7) She was doing well and taking Ativan and Valium less often because she did not need them. (*Id.*) On January 19, 2012, she complained of irritability, hallucinations, flashbacks, and difficulty sleeping, but she continued to exercise two hours a day, six days a week. (D.I. 14-11 at 76) Dr. Nisenoff noticed a change in Plaintiff's presentation and diagnosed bipolar disorder. (*Id.* at 78-79) When Plaintiff was seen on January 20, 2012, she relayed that she had had an outburst over her ex-husband's failure to pay their combined bills. (*Id.* at 74)

When Plaintiff arrived at Fort Belvoir in February 2012, after having been stationed in Okinawa, Japan, she provided a history of four significant blast exposures that had occurred during the second half of her deployment. (*Id.* at 35-38) She had lost consciousness during each event and was unable to provide much information. (*Id.*) Plaintiff became very frustrated when pressed. (*Id.*) Medical notes state that there were many inconsistencies in Plaintiff's account, but also that the events could be very unsettling for Stracco to recount. (*Id.*) A March 7, 2012 medical note states that Plaintiff has a history of multiple TBIs sustained with blast exposures during her 2007-2008

6

deployment, with the most recent injury a result of incoming rockets that caused Plaintiff to fall

down steps, lose consciousness for some time, and bleed from the ears. (D.I. 14-10 at 29)

Plaintiff began seeing Robert K. Russell, M.D.("Dr. Russell") on February 14, 2012. (D.I. 14-

11 at 40). He made a diagnosis of PTSD with a history of bipolar disorder and insomnia, and

assessed Plaintiff's GAF at 45.[6] (*Id.* at 44). Plaintiff was seen by Dr. Russell on February 21, 2012,

February 28, 2012, March 6, 2012, and March 13, 2012. (D.I. 14-9 at 71-77; D.I. 14-10 at 44-45, 82-

88; D.I. 14-11 at 12-12) When Plaintiff was seen by Dr. Russell on March 24, 2012, he made the

same diagnoses, noted her anxiety, emotional reactivity, and insomnia, and changed her medications.

(D.I. 14-11 at 14-18) Dr. Russell saw Plaintiff the next day on March 25, 2012. (D.I. 14-10 at 45-50)

On March 27, 2012, Plaintiff complained of a low mood, feelings of hopelessness and

helplessness, and suicidal thinking without intent or plan, and her therapist referred her for

emergency mental health treatment. (D.I. 14-9 at 25-27) Plaintiff was diagnosed with depression.

(D.I. 14-15 at 77) Elizabeth Greene, M.D. ("Dr. Greene"), noted that Plaintiff had significant

occupational and marital stressors, and multiple psychiatric symptoms that were being appropriately

managed by her psychiatrist, Dr. Russell. (D.I. 14-9 at 27) She assessed Plaintiff's GAF at 65. (*Id.*)

Plaintiff was seen by Dr. Russell the same day, following her visit to the emergency room. (D.I. 14-9

at 28-34)

Plaintiff continued treatment and, in 2012, was seen by Dr. Russell on May 3, 15, 23, and 24;

June 8 and 15; July 6, 18, and 27; and August 2 and 10. (D.I. 14-7 at 16-24, 71-78; D.I. 15-3 at 94-

100; D.I. 15-4 at 9-15, 40-46, 64-70 83-85; D.I. 15-5 at 30-36, 56-63; D.I. 15-6 at 12-19) When Dr.

Russell saw Plaintiff on August 10, 2012, she was upset and explained that she would be returned to

---

[6]A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *See* DSM-IV-TR at 34.

duty with a personality disorder diagnosis. (D.I. 15-3 at 96) Dr. Russell did not endorse the

diagnosis, and instead found anxiety secondary to PTSD, noting that Plaintiff was on multiple

medications due to her severe anxiety. (*Id.*)

Plaintiff's treatment was transferred from Dr. Russell to Makesha A. Joyner, M.D. ("Dr.

Joyner") in September 2012. (D.I. 15-3 at 59) Plaintiff was first seen by Dr. Joyner on September 7,

2012. (*Id.* at 47-53) Dr. Joyner diagnosed bipolar disorder, not otherwise specified vs. major

depressive disorder PTSD chronic and assessed a GAF of 65-70. (*Id.* at 52) In 2012, Plaintiff was

seen by Dr. Joyner on September 14; October 16, 22, and 25; November 6, 9, and 15; and December

12, 2012. (D.I. 15 at 64-68; D.I. 15-1 at 16-22, 29-32, 48-54, 78-80; D.I. 15-2 at 3-9, 34-43; D.I. 15-3

at 15-21, 26-32) Plaintiff was very upset during the December 12, 2012 visit. (D.I. 15 at 64) She had

been off her medication for three weeks and found that, since doing so, she was able to sleep at

night, which was an improvement. (*Id.*) She continued with issues of memory, concentration,

irritability, nightmares, and smelling things that she knows are not there. (*Id.*) Diagnoses included a

mood disorder, not otherwise specified, and chronic PTSD. (*Id.* at 66)

In early January, 2013, Plaintiff presented to clinical psychologist Erin McKee, Psy.D. ("Dr.

McKee"). (D.I. 15-10 at 54-57) Plaintiff was neatly groomed, open, cooperative, fully alert, and

oriented. (*Id.* at 55) She made good eye contact; her thought processes and speech were linear,

logical, and goal-directed; her speech had normal rhythm, rate, tone, and volume; and her insight

and judgment were intact. (*Id.* at 55) Dr. McKee diagnosed anxiety, not otherwise specified, and

depressive disorder, not otherwise specified. (*Id.* at 56) She noted that Plaintiff had recently

re-married, and her new husband often exercised with her. (*Id.* at 28, 56) Dr. McKee assessed

Plaintiff's GAF at 57-65, and opined that Plaintiff was not fit for full duty. (*Id.* at 56) On January 30,

2013, Plaintiff reported that she had stopped taking her medications and had begun eating organic

and vitamin-rich foods, in an effort to reduce her stress. (D.I. 15-9 at 78)  She also practiced a

visualization technique each morning and evening to "change her cognitions," which sometimes

helped, and she swam several days a week with her husband, and prayed.  *(Id.)*

In February 2013, Plaintiff reported that she was sleeping much better in her new apartment

off-post, but still experienced hypervigilance, exaggerated startle response, irritability, depressed

mood, and anhedonia. (D.I. 14-6 at 3-4)  On February 27, 2013, Plaintiff reported that she felt better

than she had in a long time. (D.I. 15-9 at 5)  In March 2013, Plaintiff reported that she felt some

irritability but was trying not to act on it. (D.I. 15-8 at 91)  She meditated on a daily basis to decrease

her anxiety and depression, and enjoyed swimming and taking Zumba classes with her husband.  *(Id.)*

On March 27, 2013, Plaintiff presented to the emergency room for depression, behavioral changes,

and thoughts of suicide. (D.I. 14-15 at 75)  She was discharged from the emergency room and

advised to keep her psychiatric appointment and to return to the emergency room if she worsened.

*(Id.* at 77)

In April 2013, Plaintiff was discharged from service due to physical disability with a July 2013

retirement date. (D.I. 14-6 at 3-4)  Her disability was assessed as 70% disability for TBI, also claimed

as headaches, 70% disability for PTSD, 30% disability for plantar fasciitis, 10% disability for lumbar

sprain, 10% disability for hip bursitis, 10% disability for ankle dysfunction, 10% disability for tinnitus,

and 10% disability for gastroesophageal reflux disease.  *(Id.* at 2-36)  During an April 2013 therapy

session, Plaintiff reported that she intended to return to school in the fall and was excited about her

decision. (D.I. 15-8 at 12)  Examination by her therapist indicated normal mental status findings and

the therapist assessed Plaintiff's GAF at 68.  *(Id.* at 13)

In August 2013, Plaintiff reported that she was angry with her husband for not fighting

harder to obtain custody of his child from a previous relationship. (D.I. 15-7 at 10)  She reported

that she was worried about her husband's migraines, and she was unable to sleep well due to pregnancy-related discomfort. (D.I. 15-13 at 21)  Plaintiff gave birth in September 2013. (D.I. 15-12 at 53)  A month later, she reported being anxious since giving birth, but that she was able to shop in stores, perform household chores if her husband was home, and care for her baby. (*Id.*)  She denied feeling angry or hopeless, experiencing manic or psychotic symptoms, or a desire to harm her baby. (D.I. 15-13 at 19)  She hired a "mother's helper" so she could get things done during the day. (D.I. 15-12 at 49)  Plaintiff reported that she was trying to decide between school and work. (*Id.* at 49)

On July 31, 2013, State agency psychologist Leslie Montgomery, Ph.D. ("Dr. Montgomery"), reviewed the record and opined that Plaintiff's mental impairments caused moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration. (D.I. 14-3 at 10)  On September 20, 2013, State agency psychologist Howard Leizer, Ph.D. ("Dr. Leizer"), reviewed the record and opined that Plaintiff's mental impairments caused mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation, each of extended duration. (*Id.* at 31)

Plaintiff was seen by Dr. Joyner on October 18, 2013, for mild postpartum depression and her history of PTSD. (D.I. 15-2 at 53-56)  In November 2013, Dr. McKee opined that Plaintiff was "as usual insightful," and she appeared grounded. (*Id.* at 38-39)  She described Plaintiff as anxious, but acknowledged that she was aware of how to take time for herself when she needed a break. (*Id.* at 38)  A November 26, 2013 form completed by Dr. McKee determined that Plaintiff's mental impairments caused extreme limitations in her ability to maintain attention and concentration for extended periods, and moderate to marked limitations in her activities of daily living; interacting

appropriately with and getting along with others; asking questions or requesting assistance; understanding, remembering, and carrying out simple or complex instructions and repetitive tasks; maintaining attention and concentration for extended periods; performing activities within a schedule; maintaining regular attendance; being punctual; sustaining a routine without special supervision; completing a normal workday and workweek without interruptions and performing at a reasonable pace without an unreasonable number and length of rest periods; making simple work-related decisions; responding appropriately to supervision, changes in the work setting, and customary work pressures; and being aware of work hazards. (D.I. 15-10 at 82-84)

In December 2013, Plaintiff reported that she continued to feel overwhelming anxiety and felt "trapped" sometimes when she was unable to get away from her husband and son. (D.I. 15-12 at 34) Dr. McKee advised Plaintiff that her feelings were normal and encouraged her to find activities to engage in and "give her meaning." (*Id.*) In January 2014, Plaintiff complained of worsening depression, and she was prescribed medication by Dr. Joyner. (D.I. 15-12 at 33) Later that month, Plaintiff complained of increased anxiety. (*Id.* at 28) When Plaintiff was seen by Dr. Joyner on February 18, 2014, Plaintiff reported feeling anxious, having trouble sleeping, worrying excessively, and a depressed mood. (*Id.* at 25) Dr. Joyner assessed Plaintiff's GAF at 65-70. (*Id.* at 27) Plaintiff became pregnant for a second time in February 2014. (*Id.* at 22) On June 23, 2014, Dr. McKee opined that it was very unlikely Plaintiff could succeed in full or part-time work due to PTSD and the effects of four blast injuries that had occurred during her deployment. (D.I. 158 at 27-28)

### D.     Administrative Hearings

Administrative hearings took place on February 11, 2014 and August 18, 2014, before the ALJ, with testimony from Plaintiff, who was represented by counsel, and vocational expert Dr. James Michael Ryan ("VE"). (D.I. 14-2 at 41-68)

11

### 1.    Plaintiff's Testimony

Plaintiff was 29 years old at the time of the administrative hearings and on the date of the ALJ's decision. (D.I. 14-2 at 33, 44, 58)[7] She is a high school graduate and worked as a unit supply specialist in the United States Army. (D.I. 14-2 at 44, 45, 58) Plaintiff testified that she experienced a TBI in Iraq and that she was hospitalized for sixty days in 2011 for TBI, PTSD, and depression. (*Id.* at 45, 48-49) She was transferred to the Wounded Warrior Battalion because she could no longer perform her job, and discharged from the Army in 2013. (*Id.*) Plaintiff attempted to find employment. (*Id.* at 46) At the time of the first hearing Plaintiff had one child and she was pregnant with her second child at the second hearing. (*Id.* at 51, 63)

Stracco testified that she does not drive, but that she and her husband clean and go shopping together. (*Id.* at 47-48, 59) She also testified that her husband does the cooking, cleaning, and grocery shopping. (*Id.* at 59-60) When asked about her daily activities, Stracco testified that sometimes she goes out with her husband, she tries to have some time with her son, or she waits for the baby to get up. (*Id.* at 48, 60) At the first hearing, Stracco testified that she pays someone to help care for her son because she is scared she will do something wrong. (*Id.* at 52)

Stracco also testified that her memory is off, she does not really have patience, her thoughts race, she cannot focus to read, she can do simple math with a calculator, and she has difficulty writing because her hands shake. (*Id.* at 49, 58, 61) She avoids crowds and does not like men and authority figures. (*Id.* at 50) She has "a lot" of crying spells and flashbacks. (*Id.*) She also has difficulty sleeping due to anxiety. (*Id.* at 51, 60) The PTSD causes her to check doors and windows all the time, keep the lights on, and worry that someone will take her son. (*Id.* at 62) Leaving the house is a "big trigger" for her, especially with traffic. (*Id.*)

---

[7]Individuals under the age of 50 are generally considered capable of adjusting to new jobs. 20 C.F.R. § 404.1563(c).

She receives treatment for her condition.  (*Id.* at 63)  She had been seeing a psychiatrist since 2012, who prescribed medication, but stopped seeing her because she became pregnant and the medicine caused suicidal thoughts.  (*Id.* 63-64)  She saw the psychiatrist infrequently after she moved, about once or twice a month.  (*Id.* at 64)

### 2.   Vocational Expert's Testimony

The ALJ asked the VE to assume a hypothetical person of Plaintiff's age, education, and work experience, who could perform semi-skilled light work, consisting of simple, routine tasks; and occasional interaction with supervisors, co-workers, and the general public.  (*Id.* at 65)  The ALJ further limited the hypothetical person to occasional simple decision-making and using judgment to make simple work-related decisions, and performing at a non-production pace with no production standards.  (*Id.*)  The VE testified that such a person could perform unskilled, light jobs existing in significant numbers in the national economy, including the representative occupations of laundry worker, garment worker, and packer and packaging worker.  (*Id.* at 65-66)  When asked to assume that the limitations in the hypothetical include definitions of marked impairment, extreme impairment, and marked limitations, the ALJ testified that, "based on the definitions [] presented, and using those in the accepted definitions, in it [his] opinion no jobs would exist within the residual functional capacity" that Plaintiff could perform.  (*Id.* at 66-67)

### E.   The ALJ's Findings

The ALJ concluded that Plaintiff's conditions were not disabling.  In reaching this conclusion, the ALJ first considered that the nature and severity of Plaintiff's head injury/TBI, PTSD with inattention and hyperactivity and lumbar spine pain with spasms and lordosis made them severe impairments, but also found that her depression, bipolar disorder and personal disorders diagnoses were inconsistent and did not appear as frequently as PTSD.  (*Id.* at 26)  In addition, the ALJ

13

concluded that Stracco's weight was a mild impairment, her post-partum depression was temporary, the tinnitus, otalgia, and foot pain did not establish significant functional limitations, and there was no clinical evidence of hip abnormality. (*Id.* at 26-27)  The ALJ found that although Plaintiff's impairments were subjectively severe, there was insufficient evidence of record to meet the requirements of a listing in 20 CFR Part 404, Subpart P, Appendix 1.

The ALJ determined that Plaintiff retained the residual functional capacity to perform light work,[8] except that she is limited to semi-skilled work; understanding, remembering and carrying-out instructions for simple and routine tasks; interacting with supervisors, co-workers, and the general public only occasionally; making simple decisions only occasionally; use of judgment to make simple work related decisions; the ability to perform work that does not require satisfaction of production pace; and the ability to perform work by avoiding production standards or changes generally in judgment. (*Id.* at 30)  The ALJ determined that there was not enough information available to determine whether Plaintiff could perform her past relevant work, but concluded that because there was other work she could perform, he would not delay issuance of the decision to obtain additional vocational information. (*Id.* at 38)  The ALJ concluded that Stracco was capable of performing work that exists in significant numbers in the national economy that she can perform, and, therefore, determined that Plaintiff was not disabled from January 1, 2012 through the date of the September 24, 2014 decision. (*Id.* at 38)

---

[8]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing or pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

## III.   LEGAL STANDARDS

### A.   Motion for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be -- or, alternatively, is -- genuinely disputed must be supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. § 405(g); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). However, evidence that was not submitted to the ALJ can be considered by the Appeals Council or the District Court as a basis for remanding the matter to the Commissioner for further proceedings, pursuant to the sixth sentence of 42 U.S.C. § 405(g). *See Matthews*, 239 F.3d at 592. "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported

16

by substantial evidence." *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 657 (D. Del. 2008) (internal quotation marks omitted).

The Third Circuit has explained that: "a single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence – particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983). Thus, the inquiry is not whether the Court would have made the same determination but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Even if the reviewing Court would have decided the case differently, it must give deference to the ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV.    DISCUSSION

### A.    Disability Determination Process

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). For the purposes of DIB, a "disability" is defined as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in

17

the national economy." 42 U.S.C. § 423(d)(2)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003). In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or nondisability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating finding of nondisability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of nondisability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer*, 186 F.3d at 428.

18

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a VE. *See id.*

### B.    The Issues Raised on Appeal

Stracco presents five issues in her appeal and moves for summary judgment on the grounds that the ALJ erred: (1) because his opinions were not based upon factual evidence, he misinterpreted the evidence, and relied upon unproved gossip; (2) in failing to consider the medical records in their entirety; (3) when he misinterpreted the military medical examiners' records and used the wrong standard in evaluating her PTSD; (4) because he did not give appropriate weight to her treating physicians; and (5) finding her not entirely credible. The Commissioner moves for summary judgment on the grounds that substantial evidence supports the ALJ's decision that Plaintiff is not disabled.

### C.    Evidence Considered

An ALJ is free to choose one medical opinion over another where the ALJ considers all of the evidence and gives some reason for discounting the evidence he rejects. *See Diaz v. Commissioner of Soc. Sec.*, 577 F.3d 500, 505-06 (3d Cir. 2009); *Plummer*, 186 F.3d at 429 ("An ALJ . . . may afford a

19

treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided."). Opinions of a treating physician are entitled to controlling weight when they are well-supported and not inconsistent with other substantial evidence in the record. *See Hall v. Commissioner of Soc. Sec.*, 218 F. App'x 212, 215 (3d Cir. Feb. 22, 2007) (affirming ALJ's decision to give little weight to treating physician's reports because of "internal inconsistencies in various reports and treatment notes . . . as well as other contradictory medical evidence"); *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001).

Here, the ALJ detailed his reasons for: (1) affording little weight to the opinion of treating physician Dr. McKee; and (2) affording only some weight to the opinions of Drs. Singer, Surrusco, Chalhoub, Montgomery, Leizer, and the VA disability ratings. (D.I. 14-2 at 35-37) The ALJ also discussed why he assigned little weight to the third-party function report completed by Plaintiff's spouse. (*Id.* at 37)

The ALJ discussed much of the medical evidence in detail. However, as Stracco points out, the ALJ's decision makes no reference to Dr. Russell and Dr. Joyner, both of whom treated Plaintiff for her mental health issues from February 14, 2012 through February 18, 2014, as discussed earlier in this Memorandum Opinion.[9] Although the ALJ may have acceptable reasons for excluding the medical evidence, the Court cannot discern those reasons from the decision as it currently stands. *See Fargnoli*, 247 F.3d at 42; *Plummer*, 186 F.3d at 429; *see also Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981) ("Because . . . an [ALJ] cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper."). For this reason,

---

[9]While there are passing citations to some of the medical records prepared by Drs. Russell and Joyner (*see* Tr. at 31-32), the ALJ fails to reference the physicians themselves or, more importantly, explain why their treatment records are given whatever weight they were accorded.

the Court will remand the case for a clear explanation of the ALJ's reason for his failure to consider the mental health treatment Stracco received from Drs. Russell and Joyner. *See Fargnoli*, 247 F.3d at 42 (courts should "vacate or remand a case where such an explanation is not provided").

In addition, the ALJ assigned either little weight or some weight to the medical evidence of record, but did not assign substantial weight (nor even discuss the issue) to any of the medical opinions. Hence, the Court cannot discern if the ALJ improperly substituted his medical opinion for those of the physicians who presented competent medical evidence. This provides another basis for remand. *See Plummer*, 186 F.3d at 429.

Therefore, the Court finds that the ALJ's decision is not supported by substantial evidence because the ALJ failed to articulate how he evaluated the full record of medical evidence. Remand is appropriate in order to obtain a more comprehensive evaluation.[10]

## V.     CONCLUSION

For the foregoing reasons, the Court will vacate the decision of the Commissioner; (2) remand the case further proceedings; (3) deny Plaintiff's motion for summary judgment (D.I. 16) the extent that she seeks judgment in her favor and grant it the extent that she seeks a remand; and (4) deny the Commissioner's cross-motion for summary judgment (D.I. 17).

An appropriate Order will be entered.

---

[10]The Court will not address the other grounds raised by the parties in support of their respective motions, given that remand is appropriate, as discussed above.